[Cite as *Total Quality Logistics v. Integrity Express Logistics, L.L.C.*, 2021-Ohio-4242.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC, | : | |
| Appellant, | : | CASE NO. CA2020-09-056 |
| | : | O P I N I O N |
| - vs - | | 12/6/2021 |
| | : | |
| INTEGRITY EXPRESS LOGISTICS, LLC, | : | |
| | : | |
| Appellee. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2014 CVH00268

Graydon Law, and Scott K. Jones, Daniel J. Knecht, Brian W. Fox, and Barry F. Fagel, for appellant.

Vorys, Sater, Seymour and Pease, LLP, and Jeffrey A. Miller, Victor A. Walton, Jr., and Emily E. St. Cyr, for appellee.


**PIPER, P.J.**

{¶1} Appellant, Total Quality Logistics, LLC ("TQL"), appeals a decision of the Clermont County Court of Common Pleas awarding attorney fees in favor of appellee, Integrity Express Logistics, LLC ("Integrity"). For the reasons detailed below, we affirm the trial court's decision.

{¶2} TQL and Integrity are national providers of freight brokerage services for the transportation industry. They connect customers who need freight transportation with trucking companies in exchange for a fee. This case arose after TQL alleged that its employee, Maggie Spears, provided TQL's pricing information to her boyfriend, Tyler Schlickman, an Integrity broker. TQL alleged that Schlickman used this confidential information to put together a successful bid for Wenner Bakery's transportation and brokerage needs for the year 2014. This resulted in TQL filing suit against Integrity asserting claims for misappropriation of trade secrets, unfair competition, and unjust enrichment, among others.[1]

{¶3} To defend against TQL's claims, Integrity retained the firm Vorys, Sater, Seymour and Pease L.L.P. ("Vorys"). After Vorys entered its appearance, TQL moved to disqualify Vorys based on prior work it had done for TQL between 2004 and 2010. Following an evidentiary hearing, the trial court denied TQL's motion to disqualify upon finding there was not a substantial relationship between the subject matter of Vorys' former representation of TQL and that of Vorys' present representation of Integrity. The trial court noted, however, that it would revisit the disqualification issue if necessary.

{¶4} On February 5, 2015, Integrity filed its answer to TQL's complaint denying TQL's allegations. Integrity also filed counterclaims against TQL. To support its counterclaims, Integrity alleged that TQL had tortiously interfered with its contract with Wenner Bakery. Integrity also alleged that TQL had misappropriated trade secrets concerning their own customer, West Central Florida Produce ("West Central"). Integrity further alleged that TQL had violated the prior terms of a 2012 settlement agreement by

---

1. In its amended complaint, TQL asserted claims for (1) misappropriation of trade secrets, (2) unfair competition, (3) unjust enrichment, (4) conversion, (5) enforcement of a settlement agreement, and (6) punitive damages.

recruiting Integrity employees.

{¶5}  Previously, on May 22, 2014, Integrity had sent TQL a preservation letter demanding that TQL preserve "email and other electronic communications" relevant to their claims and that TQL suspend all automatic deletion rules for electronic documents.  Integrity further demanded that TQL preserve all records and information related to Integrity, Wenner Bakery, West Central, as well as communications between TQL employees and Integrity employees.

{¶6}  TQL did not comply with Integrity's demands set forth in its preservation letter. TQL's failure to suspend automatic deletion rules, or otherwise preserve all records and information potentially relevant, resulted in the loss of innumerable documents that were otherwise discoverable by Integrity.  Relevant to this case, TQL does not appeal the trial court's decision that spoliation did occur.

**Integrity's First Motion to Compel**

{¶7}  After Integrity's preservation letter, Integrity served discovery demands on TQL requesting communications involving Maggie Spears, as well as documents and emails related to Wenner Bakery and West Central.  TQL also demanded any emails exchanged between TQL and Integrity employees.  TQL responded by indicating that it would not comply with many of the requests citing general reasons.  In essence, TQL represented that the information Integrity was requesting was not relevant and therefore need not be provided.  At no time did TQL disclose that the documents Integrity was seeking had likely been destroyed.

{¶8}  In December 2015, Integrity filed its first motion to compel.  Within the motion, Integrity explained its reasons for requesting discovery and the relevancy of the documents concerning Wenner Bakery, West Central, and Maggie Spears.  In response, TQL again did not disclose that these documents had likely been destroyed.  Instead, TQL suggested

that the relevant documents would be produced as soon as the court entered an acceptable protective order. Following a hearing, the trial court determined that the documents Integrity had requested were relevant and orally instructed TQL to produce the documents that had been withheld. The trial court then advised TQL that it would impose sanctions against it if discovery was withheld further.

{¶9} Despite the trial court's verbal order, TQL still refused to produce Maggie Spears' emails, the documents related to its work for Wenner Bakery, the documents related to West Central, or communications between TQL and Integrity employees. TQL also continued to provide misleading responses to Integrity as to why the requests were not being honored.

**Integrity's Second Motion to Compel and Discovery of Spoliation**

{¶10} In June 2016, Integrity filed a second motion to compel. TQL defended the motion to compel arguing it could not be held in contempt because the trial court's order had not been reduced to a written entry. It further responded by filing its own motion to compel against Integrity. The trial court found that TQL's motion was "completely baseless" and that its actions had "contravene[d] the spirit and substance of Civ. R. 37." It also determined that TQL had "acted reprehensibly in failing to produce relevant and discoverable information." The trial court therefore ordered, in writing, that TQL produce the requested documents and warned that if it failed to comply, the court would "consider the full range of sanctions available in Civ. R. 37(B)."

{¶11} It was only after the trial court issued its order in writing that Integrity first learned, following an exchange of correspondence with TQL's counsel, that certain documents relevant to this action had been destroyed. Upon learning information and records had not been preserved, and were now unavailable, Integrity moved the trial court for sanctions against TQL for spoliation. Integrity also sought discovery on issues relevant

to the spoliation that had occurred during the pendency of the litigation. The trial court granted Integrity's request and ordered TQL to respond to the interrogatories and the requests for the production of documents. The trial court also ordered TQL to produce a corporate representative for a Civ.R. 30(B)(5) deposition.

{¶12} Shortly before the deposition of TQL's corporate representative, TQL moved to disqualify Vorys for a second time and demanded postponement of the deposition. This time, TQL argued that Integrity was raising a new defense concerning trade secrets that the trial court indicated in a prior decision might implicate Vorys' prior representation of TQL leading to disqualification. TQL also asserted that the pursuit of discovery concerning spoliation and the filing of a Civ.R. 30(B)(5) deposition notice was a conflict of interest because it directly related to the prior representation.

{¶13} The trial court denied TQL's motion and indicated that its statement in the prior decision had been misconstrued. The trial court found the timing of TQL's renewed motion to be inappropriate and determined there was no need to disqualify Vorys as Integrity's defense counsel. Ultimately, Integrity was able to depose TQL's Chief Legal Officer ("CLO") who testified about the company's document retention policy and the destruction of documents that occurred in this case.

{¶14} On February 1, 2019, the trial court issued a 120-page analysis and order resulting in sanctioning TQL for the destruction of documents and the deception that occurred throughout the duration of litigation. In a well-articulated decision, the trial court explained the lengthy procedural history of the case, the potential relevancy of the documents withheld, and the undue delay caused by TQL. Principally, the trial court highlighted unreconcilable inconsistencies and determined that TQL had "compounded its mistakes by misleading Integrity and the court about its discovery efforts." The trial court described the testimony from TQL's CLO as "perplexing, if not outright disingenuous." The

trial court found that TQL "chose a reckless course founded upon a sanguine hope that the court would not compel it to produce destroyed evidence." The court further observed that "years of discovery battles, motion practice, and hearings could have been avoided" if TQL had been forthcoming about its destruction of documents.[2] The trial court then ordered as a sanction that TQL be responsible for Integrity's costs and attorney fees associated with the discovery disputes and spoliation of evidence.

{¶15} In order to determine the amount of the award against TQL, the trial court held an evidentiary hearing. During this hearing, Integrity supplied the trial court with data from Vorys' timekeeping and billing systems of all entries and dollar amounts associated with the discovery disputes and TQL's spoliation, which totaled $790,312.55. Combined with expenses and hearing preparation, Integrity calculated attorney fees in the amount of $888,643.09. Both TQL and Integrity presented evidence from their respective expert witnesses about the reasonableness of such fees and costs. The trial court ultimately awarded Integrity $392,487.45 in attorney fees and $20,451.62 in costs. TQL now appeals, raising three assignments of error for review.

{¶16} Assignment of Error No. 1:

{¶17} THE TRIAL COURT ERRED BY NOT DISQUALIFYING COUNSEL FOR INTEGRITY.

{¶18} In its first assignment of error, TQL argues the trial court erred by failing to disqualify Vorys from its representation of Integrity based on prior work that the firm had done for TQL. We find no merit to TQL's arguments.

{¶19} In reviewing a trial court's decision to disqualify a party's counsel, we apply an abuse of discretion standard. *Lytle v. Mathew*, 8th Dist. Cuyahoga No. 104622, 2017-

---

2. Nearly five years had elapsed from the time TQL filed its complaint.

- 6 -

Ohio-1447, ¶ 11, citing *155 N. High, Ltd. v. Cincinnati Ins.* Co., 72 Ohio St.3d 423, 426 (1995). The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶20} Pursuant to Ohio Prof. Cond. Rule 1.9:

> Unless the former client gives informed consent, confirmed in writing, a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client.

{¶21} A "substantially related matter" is defined as "one that involves the same transaction or legal dispute or one in which there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation of a client would materially advance the position of another client in a subsequent matter." Ohio Prof. Cond. Rule 1.0(n).[3]

{¶22} To resolve TQL's motions for disqualification, the trial court considered Ohio Prof. R. Cond. Rule 1.9 and a three-part test articulated by the Sixth Circuit Court of Appeals in *Dana Corp. v. Blue Cross & Blue Shield Mut.*, 900 F.2d 882, 889 (6th Cir.1990). The *Dana* test requires a trial court, when considering a motion to disqualify, to determine whether (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the past subject matter of the previous relationship is substantially related to the current subject matter of litigation; and

---

3. The official comments to the rule state, in relevant part, that:

> In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation.

Ohio Prof. Cond. Rule 1.9, Comment 3.

(3) the attorney acquired confidential information from the party seeking disqualification. *In re P.G.T. v. Trageser*, 7th Dist. Columbiana No. 14 CO 0034, 2016-Ohio-3429, ¶ 17; *Fried v. Abraitis*, 8th Dist. Cuyahoga No. 103070, 2016-Ohio-934, ¶ 12. *See also Cargould v. Manning*, 10th Dist. Franklin No. 09AP-194, 2009-Ohio-5853, ¶ 10 (Ohio Prof. Cond. Rule 1.9 did not supersede and replace the *Dana* analysis).

{¶23} In the present case, it is undisputed that there was a past attorney-client relationship between TQL and Vorys. The record reflects that Anthony Osterlund, a partner with Vorys, along with several other attorneys from that firm, represented TQL in one case in 2004 and in approximately 15 other cases between 2006 and 2010. The representations primarily involved employment matters concerning breaches of non-compete agreements.

{¶24} Osterlund testified that he worked most closely with Jeff Montelisciani, TQL's Senior Vice President of Sales. Montelisciani would notify Osterlund when he believed a non-compete agreement had been violated. Montelisciani would then assist in developing the case. Montelisciani recalled that Vorys worked primarily on cases involving non-compete and trade secret issues, along with some cargo claims and a review of a vendor software contract.

{¶25} Osterlund testified that in 2005 or 2006 he spent the day on the TQL sales floor where he sat with one or two brokers to get an overview of TQL's business. Osterlund testified that he did not discuss a bid for a freight broker's business at any time during that visit. Osterlund also testified that he did not recall any specific pricing information being provided to him during his representation. Osterlund instead testified that he recalled only that the information provided to him was general in nature.

{¶26} Montelsciani testified that he had discussions with Osterlund about trade secrets. Montelsciani testified that this included a discussion that the information contained in TQL's software program known as Load Manager would constitute a trade secret

because it contained customer lists, rates billed to customers, and rates paid to carriers. Montelsciani testified that he gave Osterlund "a pretty high-level view of how we bid on freight through the Load Manager system."

{¶27} Osterlund testified that he made suggestions to Montelsciani as to how to protect information identified as confidential and trade secrets. Osterlund also testified and acknowledged preparing drafts of non-compete agreements for TQL but denied having knowledge or access to specific customer pricing information. Osterlund further testified that he never discussed pricing or rate information and that none of the matters litigated by Vorys on behalf of TQL involved a bid for a customer contract or a bid for freight brokerage business.

{¶28} Another partner for Vorys, Victor Walton, testified that the firm engaged in several conflict checks and determined there was no conflict in representing Integrity given the TQL representation terminated three years prior and involved primarily non-compete issues.

{¶29} As noted above, the trial court denied TQL's initial motion to disqualify on the basis that Vorys' past representation of TQL and its present representation of Integrity were not substantially related. Therefore, because the representations were not substantially related, the trial court determined that TQL need not be disqualified. In so holding, the trial court stated:

> [T]he Vorys firm was not privy to specific pricing information that was used to develop the bid for [Wenner Bakery's] business. There is also no allegation that the Vorys firm represented the specific employee who is alleged to have disclosed the information at issue. Therefore, the firm had no knowledge of specific facts gained in its prior representation that are relevant to the matter in question which would ordinarily preclude representation in this case.

{¶30} We find the trial court's decision is supported by the record and does not

constitute an abuse of discretion. TQL's claims in this case concerned allegations that an Integrity employee obtained TQL's pricing information and used that information to successfully bid for Wenner Bakery's transportation and brokerage needs for the year 2014. Vorys' prior cases representing TQL, however, were primarily employment cases filed against TQL employees to enforce non-compete agreements. None of those prior matters involved Wenner Bakery, pricing and bids, Maggie Spears, or allegations of misappropriation by a competitor.

{¶31} TQL nevertheless argued that Vorys was privy to confidential information in its prior non-compete cases. TQL, however, never explained how such information had any relevance to Integrity's defense of the claims asserted here. TQL also asserted that Vorys prepared TQL Sales VP, Montelisciani, for a deposition in an employment case. Beyond hypothetical speculations TQL never explained how anything discussed during that preparation relates to the Wenner Bakery procurement claims. Simply stated, despite TQL's suggestions to the contrary, the record reflects that the trial court both applied the correct legal standard and fully considered the evidence presented by both parties.

{¶32} In this case, TQL had the burden of establishing that this matter was substantially related to Vorys' prior representation and failed to meet that burden. *Shawnee Assoc., L.P. v. Shawnee Hills*, 5th Dist. Delaware No. 07CAE050022, 2008-Ohio-461, ¶ 18. Though Vorys may have acquired general knowledge of TQL's policies and practices, there is no specific trade information that it would have acquired concerning the relevant issues or parties involved in this dispute. The record does not demonstrate Vorys acquired confidential information in its past relationship with TQL which gave it an unfair advantage in the current litigation. We agree with the trial court that Vorys' past representation of TQL and its present representation of Integrity were not substantially related as contemplated in the *Dana* test and in Ohio Prof. Cond. Rule 1.9 and Ohio Prof. Cond. Rule 1.0(n).

{¶33} This is true also for TQL's second motion for disqualification. As noted above, after Integrity moved for discovery relevant to the spoliation that had occurred during trial, TQL moved for disqualification a second time. In so doing, TQL alleged that Vorys had presented a new defense that defied an earlier admonition from the trial court that certain defenses raised in its representation of Integrity could potentially cause a conflict of interest.[4] TQL also argued, for a variety of reasons, that Vorys should be disqualified based on its pursuit of a Civ.R. 30(B)(5) deposition and related discovery. After review of the record, we find TQL's arguments regarding its second motion for disqualification to also be without merit.

{¶34} In this case, the trial court was well aware of the defenses raised by Integrity and its prior admonition concerning a potential conflict of interest concerning trade secrets. With that knowledge, the trial court determined that TQL had misconstrued its prior written decision and reaffirmed that there was no conflict of interest and no need to disqualify Vorys as Integrity's counsel. The trial court also clarified that it never intended to suggest that Vorys could not challenge whether past pricing was a trade secret as a matter of law; it only meant that there could be a conflict if Vorys were challenging the adequacy of the steps TQL took to protect trade secret information.

{¶35} The trial court further noted that TQL had forfeited the objection. This is because Integrity had raised this defense more than a year prior. By allowing a year of litigation to pass without objection, the trial court found that TQL had forfeited any right to seek disqualification on those grounds. Finally, the trial court found that Integrity's request to depose a corporate representative relevant to the spoliation claims did not create a need to disqualify them from this case.

---

4. The trial court had previously noted that if Integrity challenged whether TQL's pricing was a trade secret, it might revisit the issue of disqualification.

{¶36} Having reviewed the record, including the detailed decisions issued by the trial court, we find the trial court did not err or abuse its discretion by also denying TQL's second motion for disqualification. We agree that TQL once again failed to meet the second prong of the *Dana* test. There was no substantial relation or commonality of issues as contemplated in the *Dana* test or in Ohio Prof. Cond. Rule 1.9 and Ohio Prof. Cond. Rule 1.0(n). We also agree that TQL's second motion for disqualification was untimely, as TQL waited more than a year before it filed its renewed motion.[5] Finally, we disagree with TQL's argument that Integrity's pursuit of discovery, including the Civ.R. 30(B)(5) deposition of a TQL corporate representative, demonstrates a conflict of interest. Therefore, for the reasons outlined above, we find the trial court did not err by denying TQL's second request for disqualification. TQL's first assignment of error is therefore overruled.

{¶37} Assignment of Error No. 2:

{¶38} THE TRIAL COURT ERRED BY AWARDING INTEGRITY ANY ATTORNEYS' FEES AND COSTS AS A SANCTION FOR SPOLIATION.

{¶39} In its second assignment of error, TQL argues the trial court erred by awarding Integrity attorney fees and costs as a sanction for spoliation. In so doing, TQL alleges that the trial court's failure to disqualify Vorys "tainted" the discovery disputes such that the trial court's discovery order and the awarded sanctions should be vacated. However, we find this issue is moot based upon our resolution of TQL's first assignment of error. As noted above, the trial court did not err by failing to disqualify Vorys and the trial court's order for sanctions is supported by the record. Therefore, TQL's second assignment of error is

---

5. In its January 11, 2016 brief, Integrity argued that TQL's historic pricing information was not confidential and raised this issue again in its May 6, 2016 oral argument. TQL argued that this violated the trial court's prior admonition and was a conflict of interest. However, TQL did not move for recusal on this allegedly new defense until March 9, 2017. *See, e.g., Barberton Rescue Mission v. Hawthorn*, 9th Dist. Summit No. 21220, 2003-Ohio-1135, ¶ 7 (finding the trial court erred in failing to consider waiver when movant waited five months before filing for disqualification and in that time the opposing party had spent a significant amount of time and resources preparing the case with counsel).

overruled.

{¶40} Assignment of Error No. 3:

{¶41} THE TRIAL COURT'S AWARD OF $412,939.07 IN ATTORNEYS' FEES AND COSTS TO INTEGRITY AS A SANCTION FOR PURPORTED DISCOVERY ABUSES WAS ARBITRARY, UNREASONABLE, AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶42} As noted above, TQL does not appeal the finding that spoliation occurred in this case. Rather, TQL appeals from the trial court's decision to award attorney fees and costs as sanctions for that spoliation. Therefore, in its third assignment of error, TQL alleges the trial court's award of attorney fees was arbitrary, unreasonable, and against the manifest weight of the evidence. We find TQL's argument to be without merit.

{¶43} A trial court has discretion to determine the appropriate amount of attorneys' fees to award in each case, and thus, a fee award is not overturned on appeal absent an abuse of discretion. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). Accordingly, "[u]nless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." *Id.* This is because the trial judge participated not only in the trial, but in the preliminary proceedings and thus occupies the best position to gauge the value of services rendered by lawyers who have tried the case in that court. *Id*; *Bigler v. Personal Serv. Ins. Co.*, 7th Dist. Belmont No. 12 BE 10, 2014-Ohio-1467, ¶ 193.

{¶44} When calculating the amount of attorney fees, a trial court is guided by a two-step determination. *Lamar Advantage GP Co. v. Patel*, 12th Dist. Warren No. CA2011-10-105, 2012-Ohio-3319, ¶ 46. "The court should first calculate the 'lodestar' amount by multiplying the number of hours reasonably expended by a reasonable hourly rate and, second, decide whether to adjust that amount based on the factors listed in Prof.Cond.R.

- 13 -

1.5(a)." *Id.*, citing *Bittner* at syllabus. *See also Phoenix Lighting Group, L.L.C. v. Genlyte Thomas Group, L.L.C.*, 160 Ohio St.3d 32, 2020-Ohio-1056, ¶ 12. Those factors include the time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly, the amount involved and the results obtained, the experience, reputation, and ability of the lawyer or lawyers performing the services, and whether the fee is fixed or contingent. *Ohio Valley Associated Bldrs. & Contrs. v. Rapier Elec., Inc.*, 12th Dist. Butler Nos. CA2013-07-110 and CA2013-07-121, 2014-Ohio-1477, ¶ 59.

{¶45} In support of its fee request, Integrity presented a binder of billing records that Vorys believed to be related to the order for sanctions. James Kelly, the Vorys attorney who controlled the billing on the Integrity account, described the time entry procedures at his law firm. Kelly testified that all of the attorney time was billed in tenths of an hour. Kelly also testified that in preparing for the costs and fees hearing, his firm removed everything that did not have anything to do with the sanctions for spoliation. Kelly stated that this was accomplished by going through the billing records, line by line, to remove the unrelated time records.

{¶46} Kelly identified the time records that his firm designated as "Discovery Motions and Related Briefing that Led to Sanctions." The total attorney fees reflected in the time records for these motions and related briefing was $493,538.50. Kelly also identified time records designated as "Other Discovery-Related Motions Arising from the Discovery Disputes." The total attorney fees for these motions amounted to $25,643.00. A third set of time records identified by Kelly was styled "Other Fees that were Tainted by TQL's Conduct" and totaled $271,032.05. The total attorney fees that Kelly testified were caused or impacted by TQL's spoliation and cover-up was $790,213.55. Finally, Vorys presented fees of $54,716.00 for work in preparation for the costs and attorney fees hearing and the

estimated fees of their expert witness of $11,500.00.

{¶47} Brian O'Connor, Integrity's expert witness, also testified. O'Connor testified that Vorys charged at the higher end of the spectrum of fair and reasonable rates in the Cincinnati market. However, he testified that the fees were in line with rates from other competing firms and reasonable given the quality of legal work and the extensive discovery battles that occurred during the case.

{¶48} To refute the amount Integrity claimed, TQL called Gary Winters as its expert regarding attorney fees. Winters' opinion was that the rates charged by Vorys' attorneys were excessive. Winters stated that the younger associates should have been billed at a more reasonable rate and more work should have been delegated to them at a lower rate. Winters also questioned the number of hours that Vorys' attorneys billed for certain work. Based on his calculation, Winters believed that a reasonable fee for Vorys' work was $85,953.00. TQL also called into question the form in which Integrity presented Vorys' billing information suggesting it was not reliable and should not be considered as credible.

{¶49} The trial court took the matter under advisement. Following review, the trial court found that Vorys' rates were reasonable billing rates in the Cincinnati market area for services rendered by attorneys of reasonable comparable skills, experience, and reputation. The trial court recognized that the customary client billing rate of the Vorys firm is one reliable indicia of the reasonable attorney fee rate in the market. Integrity's expert witness testified that Vorys' fees were at the high end of the scale, yet the trial court found the rate was reasonable based on Vorys' reputation and the fact that the case was "high stakes litigation." The trial court also noted that "[a]nother indica of reasonableness is the fact that Integrity knowingly and willingly entered into the attorney/client relationship knowing the rates charged by the Vorys firm."

{¶50} The trial court disagreed, however, with certain fees that Integrity suggested

were recoverable. The trial court determined that Integrity was only entitled to recover attorney fees and costs that were directly related to the discovery disputes and pursuit of documents spoliated. These time records encompass the years 2015 through 2019. The trial court disregarded fees for TQL's second motion to disqualify Vorys. The trial court also excluded certain hours as being unreasonable or unnecessary. The trial court then calculated the lodestar amount as $451,135.00. The trial court further reduced this figure by 13 percent based on the testimony of Kelly, who explained that he authorized a 13 percent discount in fees because the fees were "getting out of hand" for a net figure of $392,487.45. Based on its review of the evidence, the trial court awarded Integrity's counsel $392,487.45 in reasonable attorney fees and costs in the amount of $20,451.62.

{¶51} Based on our review of the record, we find the trial court did not abuse its discretion in its decision awarding attorney fees and costs. The record reflects that the trial court heard competing testimony concerning the reasonableness of attorney fees. The record reflects that Vorys' time records, along with the description provided by Kelly's testimony, provided the detail necessary for the court to determine the time reasonably expended on the relevant motion resulting in sanctions. Contrary to various arguments raised by TQL, the information related to hours expended were properly admitted and there is no evidence that the trial court based its sanctions award on any misunderstanding of the case or for any improper motive.[6] Rather, the record reflects that the trial court's decision was supported by an extensive evidentiary record and the trial court fairly and appropriately scrutinized the billing data in fashioning its sanctions award. Accordingly, we find TQL's

---

6. We note that certain exhibits went missing during the pendency of the case. However, the record reflects that the trial court was able to review the entire record and did not ignore TQL's exhibits. TQL had an opportunity to supply the trial court with copies of any missing exhibits (which the trial court noted it had already seen and sufficiently reviewed for purposes of making its decision). Other than identifying a slight irregularity, TQL demonstrates no prejudice. This court had similar issues with missing exhibits in this appeal. As a result, we sua sponte issued an Entry Supplementing the Records with Exhibits pursuant to App.R. 9(E).

third assignment of error is without merit and is overruled.

{¶52} Judgment affirmed.


M. POWELL and BYRNE, JJ., concur.